## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIAM JACKSON,<br>KATHLEEN JACKSON, solely in her capacity as Trustee for the Kathleen P. Jackson Trust,<br>CHICAGO TITLE AND TRUST COMPANY, solely in its capacity as Trustee for Trust No. 05-16-106-074-0000,<br>435 SHERIDAN LLC, an Illinois limited liability company,<br>ANDREW G. BLUHM,<br>CALM RESIDENTIAL LLC, an Illinois limited liability company,<br>AMANDA DAY,<br>JOHN AND FRANCESCA EDWARDSON,<br>MARY ANN FITZGERALD,<br>CHRISTINE E. FUSSELL, solely in her capacity as Trustee for the Christine E. Fussell Revocable Trust,<br>STEPHEN R. FUSSELL, solely in his capacity as Trustee for the Stephen Ryan Fussell Revocable Trust,<br>459 SHERIDAN ROAD LLC, an Illinois limited liability company,<br>CHICAGO TITLE LAND TRUST COMPANY, solely in its capacity as Trustee for Trust No. 8002363558,<br>DMITRY AND VICTORIA GODIN,<br>CHICAGO TITLE LAND TRUST COMPANY, solely in its capacity as Trustee for Trust 9622,<br>411 SHERIDAN LLC, an Illinois limited liability company,<br>HARA INVESTMENTS LLC, an Illinois limited liability company,<br>BARBARA JANE IRWIN,<br>KAREN S. KIERSEY, solely in her capacity as Trustee for the Karen S. Kiersey Revocable Trust,<br>445 SHERIDAN LLC, an Illinois limited liability company,<br>WILLOW TRUST MANAGER, LLC, solely in its capacity as Trustee for the Willow Road Trust, | Case No.: 24-cv-03576 |

TERRY AND DONNA MCKAY,
CHICAGO TITLE LAND TRUST
COMPANY, solely in its capacity as Trustee
for Trust No. 8002389583,
BARBARA AND RICHARD SILVERMAN,
765 SHERIDAN ROAD LLC, an Illinois
limited liability company, and
HENRY SUGAR, LLC, a Delaware limited
liability company,

         Plaintiffs,

v.

VILLAGE OF WINNETKA,

         Defendant.

## **COMPLAINT AND JURY DEMAND**

Plaintiffs, WILLIAM JACKSON, KATHLEEN JACKSON, solely in her capacity as Trustee for the Kathleen P. Jackson Trust, CHICAGO TITLE AND TRUST COMPANY, solely in its capacity as Trustee for Trust No. 05-16-106-074-0000, 435 SHERIDAN LLC, an Illinois limited liability company, ANDREW G. BLUHM, CALM RESIDENTIAL LLC, an Illinois limited liability company, AMANDA DAY, JOHN AND FRANCESCA EDWARDSON, MARY ANN FITZGERALD, CHRISTINE E. FUSSELL, solely in her capacity as Trustee for the Christine E. Fussell Revocable Trust, STEPHEN R. FUSSELL, solely in his capacity as Trustee for the Stephen Ryan Fussell Revocable Trust, 459 SHERIDAN ROAD LLC, an Illinois limited liability company, CHICAGO TITLE LAND TRUST COMPANY, solely in its capacity as Trustee for Trust No. 8002363558, DMITRY AND VICTORIA GODIN, CHICAGO TITLE LAND TRUST COMPANY, solely in its capacity as Trustee for Trust 9622, 411 SHERIDAN LLC, an Illinois limited liability company, HARA INVESTMENTS LLC, an Illinois limited liability company, BARBARA JANE IRWIN, KAREN S. KIERSEY, solely in her capacity as

Trustee for the Karen S. Kiersey Revocable Trust, 445 SHERIDAN LLC, an Illinois limited liability company, WILLOW TRUST MANAGER, LLC, solely in its capacity as Trustee for the Willow Road Trust, TERRY AND DONNA MCKAY, CHICAGO TITLE LAND TRUST COMPANY, solely in its capacity as Trustee for Trust No. 8002389583, BARBARA AND RICHARD SILVERMAN, 765 SHERIDAN ROAD LLC, an Illinois limited liability company, and HENRY SUGAR, LLC, a Delawares limited liability company (collectively "Plaintiffs"), by and through their attorneys, Baker & McKenzie LLP, for their complaint against Defendant Village of Winnetka ("Winnetka") state as follows:

## PRELIMINARY STATEMENT

On February 6, 2024, following a legally deficient administrative process, Winnetka amended its Zoning Ordinance to enact MC-01-2024, a punitive bluff regulation that prohibits or otherwise severely limits Plaintiffs' ability to develop their private properties located along the shoreline of Lake Michigan. The ordinance deprives Plaintiffs and other lakefront property owners in Winnetka of the value, use, and enjoyment of their bluffs and the lakefront properties for which they paid substantial sums. Winnetka's unfounded and misguided reliance on a rote statement of protecting "public health, safety, and welfare" to justify this blatant and unjustified attack on Plaintiffs' property rights rests on false premises. The public does not own the bluffs. The public has no legal access to the bluffs. No bluffs located in Winnetka, and certainly no bluffs on Plaintiffs' private properties, have ever failed. There is no safety hazard to the public. There is no safety hazard related to bluff development undertaken consistent with Winnetka's long-established building and permitting requirements. Moreover, the public has no obligation to expend resources to maintain the bluffs. Instead, that obligation and that expense remains with Plaintiffs, the very parties from whom Winnetka has deprived the right to use and enjoy that same

property. Plainly put, Winnetka cannot mandate aesthetic preferences through an ordinance enacted under the guise of protecting the "public health, safety, and welfare."

In passing MC-01-2024, Winnetka caused Plaintiffs and other private property owners along the lakefront damages in an amount well beyond Winnetka's annual revenues. It is no exaggeration that, when considering all the private properties in Winnetka negatively impacted by MC-01-2024, damages may well be in the hundreds of millions of dollars. Outrageously, Winnetka never even considered the devastating economic impact of passing and, ultimately, enforcing this ill-defined and unjustified ordinance. That economic impact includes severe diminution of property values throughout the village, the resulting damage to Plaintiffs and other property owners, and the potential for legal damages beyond Winnetka's ability to pay. Winnetka's process violated the procedural and substantive due process rights of Plaintiffs and deprived Plaintiffs of property without just compensation under Federal and Illinois law. The ordinance should be invalidated. If not, Plaintiffs should be compensated in full for the taking of their property.

## **PARTIES**

1.      Plaintiffs are residents of, and property owners in Winnetka, which is in the State of Illinois.

2.      On information and belief, Defendant Village of Winnetka is a municipal body existing under the laws of the State of Illinois and the Illinois Municipal Code, 65 ILCS 5/1.

3.      Plaintiffs listed herein are fewer than the group of potential plaintiffs whose private properties have been or may be negatively impacted by the MC-01-2024. Plaintiffs reserve their rights to amend their Complaint and Jury Demand to add additional plaintiffs with respect to Count II and III.

## JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over the action because Winnetka is a municipal body existing under the laws of the State of Illinois, and Winnetka is located in this district.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under federal law, specifically United States Const. amends. V & XIV and 42 U.S.C. § 1983.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because Defendant is located in the Northern District of Illinois and the events or omissions giving rise to Plaintiffs' claims occurred here.

## BACKGROUND

### A.  Timeline Leading Up to the Passage of MC-01-2024

7.      According to Winnetka's Engineering Department, there are 112 properties in Winnetka along the Lake Michigan shoreline and the vast majority of those properties are privately owned.

8.      At a January 10, 2023 Study Session of the Winnetka Village Council (the "Council"), Winnetka's Village President Chris Rintz announced that the Council would be providing an "educational component regarding the lakefront regulations related to private and public land." During that Study Session, the Council discussed lakefront zoning and regulation in other Illinois communities along Lake Michigan.

9.      During the public comment portion of the Study Session, a resident encouraged the Council to allow a subcommittee for lakefront homeowners to discuss issues impacting private lakefront properties. On information and belief, no such subcommittee was ever established.

10. At that same Study Session, another resident urged the Council not to amend the existing ordinances that governed development in the steep slope areas.

11. At a July 6, 2023 Regular Council Meeting, the Council introduced MC-08-2023, which amended "the Text of the Village Zoning Ordinance to [e]stablish a Study and Permit Abeyance Period for Construction in the Steep Slope Area Along Lake Michigan." The stated purpose of MC-08-2023 was to establish a study period from July 6, 2023 to April 6, 2024 and to pause construction activity in the steep slope zone (the "Permit Abeyance Period").

12. At the July 6, 2023 Regular Council Meeting, multiple residents voiced concerns about the Permit Abeyance Period and its negative impact on lakefront property values. The Council disregarded those concerns.

13. At a July 18, 2023 Regular Council Meeting, President Rintz "assure[d] members of the public that the Village [was] not seeking to interfere with homeowner property rights but rather [to] utilize the study and permit abeyance period to ensure that Council can make the best decisions regarding the issues at hand."

14. Concerns related to the moratorium were again raised at the July 18, 2023, Regular Council Meeting. Once again those concerns were disregarded.

15. The Council adopted MC-08-2023 at the July 18, 2023 Regular Council Meeting.

16. During the Permit Abeyance Period, Winnetka did not accept applications for, and did not issue, any permits for new construction within the steep slope zone.

17. At a September 12, 2023 Council Study Session, the Council discussed potential lakefront regulations relating to construction in the steep slope bluff area along Lake Michigan.

18.     At that same session, "President Rintz inform[ed] members of the public that the purpose of the study session [was] to discuss matters relating to the lakefront regulations and [that] there w[ould] not be any adoption of rules and/or regulations."

19.     At the time, the Council still had not made clear why it was considering steep slope bluff regulations for the properties along Lake Michigan.  During the Public Comment portion of the Study Session, one attendee requested that the Council "indicate their purpose for implementing steep slope regulations."

20.     Additionally, at the September 12, 2023 Study Session, residents and property owners once again voiced opposition to the implementation of regulations along the lakefront. Once again, these concerns were not considered.

21.     On January 9, 2024, the Council held a public hearing introducing an initial version of MC-01-2024.  The President and the Council initiated an application to consider amending Title 17, "Zoning" of the Winnetka Code of Ordinances ("Zoning Ordinance") concerning establishing bluff regulations for development in the steep slope area along Lake Michigan and to amend the definitions for the lot line and the front yard setback along Lake Michigan ("Code Amendments").

22.     Members of the public voiced concerns about MC-01-2024 negatively impacting property use, property rights and property values.

23.     At that Regular Council Meeting, President Rintz "emphasized the importance of trust and having a collaborative approach on Village business between the Council and the residents on Village."

24.     At the February 6, 2024 Regular Council Meeting, multiple members of the public once again voiced their concerns that MC-01-2024 would have a negative impact on their property

values along Lake Michigan and noted the potential need for compensation for the takings. The Council did not address these concerns.

25. At that same meeting on February 6, 2024, President Rintz acknowledged that he had had "never been sure whether this… ordinance was absolutely necessary." He went on to state, however, that certain property owners had "taken negative paths" and diverted from "appropriate behavior and taste." At no point at the meeting did President Rintz indicate that a bluff regulation was necessary for protecting the "public health, safety, and welfare."

26. At that same meeting on February 6, 2024, with little to no debate or analysis and before the official end of the Permit Abeyance Period, the Council adopted a final version of MC-01-2024. Ex. 1, MC-01-2024 (as enacted) ("the Ordinance").

**B. The Ordinance as Enacted**

27. MC-01-2024 states its purpose as:

Bluffs are inherently fragile and subject to erosion due to glacially formed soils containing unstable sediment, rock and silt. Development and construction activity in and around bluffs could be hazardous to people and property and could accelerate the erosion process. This Chapter is not intended to regulate the aesthetic qualities of the bluffs. Instead, this Chapter is intended to protect the bluffs and ensure that construction on the bluffs of Lake Michigan within the Village do not cause environmental or ecological damage to Lake Michigan or the surrounding areas of the Village, or otherwise create harm or risk to the public health, safety, and welfare of the Village, its residents, or visitors.

28. The Ordinance's purported justification based on "health, safety, and welfare" are nonsensical because the bluffs in question are all present on private property, and present no danger to the public beyond the boundary of the private property.

29. Further, the Ordinance's premise that the Winnetka bluffs are glacially formed is untrue.

30.     Winnetka failed to provide any geotechnical, erosion, vegetation, soil, bluff, slope or Lake Michigan water level analysis or report regarding the slope or high water mark to support the need or basis for the Ordinance. Moreover, Winnetka has failed to explain how the Ordinance advances the stated objectives of erosion protection, and in fact it does not advance such objectives.

31.     Residents, including Plaintiffs, were shut out of meaningful collaboration with respect to the Ordinance. Winnetka failed, at all times, to provide essential information to the public regarding the need for and basis of the Ordinance to enable a meaningful opportunity for Plaintiffs and the public to evaluate and comment on the Ordinance.

32.     MC-01-2024 amended Section 17.30.050 of the Zoning Ordinance of Winnetka titled "Front and Corner Yard Setbacks," of Chapter 17.30, titled "Lot, Space, Bulk and Yard Regulations for Single-Family Residential Districts," of Winnetka's Zoning Ordinance, by adding a new subsection I(7) to Section 17.30.050, which was as follows:

"Section 17.30.050 Front and Corner Yard Setback. Exceptions and Limitations.

7.     Front Yard Setbacks for Lakefront Properties. Development on lots abutting Lake Michigan between the ordinary high water mark of Lake Michigan and the tableland as defined by Section 17.82.020 will also comply with Chapter 17.82, Steep Slope Regulations and Chapter 15.78 Lakefront Construction. For lots abutting Lake Michigan, the required front yard setback is the toe of the bluff or 50 feet from the ordinary high water mark, whichever results in the line farthest from the ordinary high water mark."

33.     Chapter 17.82 of Winnetka Code was introduced and adopted with MC-01-2024. Ex. 1, Ex. A to MC-01-2024, Chapter 17.82, Steep Slope Regulations ("Steep Slope Regulations").

34.     Section 17.82.020 established a "Steep Slope Impact Area" which includes lots that include or are adjacent to a bluff, and is defined as "that portion of the lot lying between: (1) [t]he toe of the bluff; and (2) [t]he line representing the intersection of the table land (or if no such

9

intersection, the table land extended) of such lot with a 22 degree slope (2.5H:1V ratio) extending upward from the toe of the bluff ..." Steep Slope Regulations, § 17.82.020.

35. Each of Plaintiffs' private property includes a Steep Slope Impact Area as defined above.

36. MC-01-2024 divides the Steep Slope Impact Area into portions that correspond to different development prohibitions. Section 17.82.040 established prohibitions on development in the "Steep Slope Zone," and sets forth:

> A. Any Development that is authorized pursuant to [Winnetka] Code, this Title, or other ordinance or regulations of [Winnetka], *may* occur in the steep slope zone *if approved by the Director*, upon review of an application in accordance with this Chapter; provided, however that *only the following structures are permitted* within the steep slope zone ..." [Emphasis added.]

37. In other words, MC-01-2024 not only amended Winnetka's existing zoning ordinance to create a newly defined "Steep Slope Zone," it also, for the first time in Winnetka, **prohibits** all development on private property in that zone outside the *possibility* of being granted permission to build a few defined and discrete structures as detailed below. Specifically, MC-01-2024 prohibits construction and expansion of, among other things, residences within the Steep Slope Zone.

38. Section 17.82.040 limits development in the Steep Slope Zone to the following structures *subject to Director approval*:

- Retaining walls and other structures that are necessary for slope stabilization;
- Structures on the exact foundation of a previously existing structure;
- Mechanical and electrical lifts;
- Stairs not greater than five feet in width;
- Decks not greater than 50 square feet;
- Fences; and
- Boat houses.

*Id.* § 17.82.040.

39.     The provision for the possible, discretionary development of the discrete and, for the most part, purely functional structures does not mitigate the Winnetka's violations of law nor its takings.

40.     The Steep Slope Zone is defined as the portion of the slope impact area of a lot that lies between the steep slope line and the toe of the bluff. *Id.* § 17.82.020.  The Steep Slope Line means a line representing the intersection of the table land (or if no such intersection, the table land extended) with a 27 degree slope (2H:1V) extended upward from the toe of the bluff. *Id.* The Table Land means land at the top of a bluff where the slope is less than a 5.7 degree slope (10H:1V ratio). *Id.*

41.     Moreover, MC-01-2024 adopted new regulations that require Plaintiffs and other residents to acquire permits to develop on other areas of their private property outside the Steep Slope Zone.

42.     Plaintiffs and residents must obtain approval from Winnetka's Director of Engineering for development in the "Steep Slope Transition Area." *Id.* § 17.82.030. The Steep Slope Transition Area is the portion of slope impact area of a lot lying outside the Steep Slope Zone. *Id.* § 17.82.020.

43.     Section 17.82.050 establishes the development standards in the Steep Slope Transition Area and, again, gives Winnetka's unelected Engineering Director enormous discretion to grant and deny permits.

44.     Section 17.82.050 sets forth that "the Director … will consider [an] application in light of the standards of this section relating to landscape planning, soil mechanics engineering, hydrology, geology, environmental design, structural and coastal engineering, and structural architecture." *Id.* § 17.82.050.  Moreover, Winnetka's Engineering Director "may determine that

11

certain standards of [Section 17.82.050] do not apply to every application." *Id.* Under Section 17.82.050 "[t]he [Engineering] Director will have the authority to determine if the application *in its totality* satisfies the purposes of this Chapter …." *Id.* [Emphasis added.]

45.     The permitting process in MC-01-2024 is unreasonably vague, ambiguous and unreasonable in that it provides the Engineering Director with undefined latitude on what will matter for a permit application and what is required for a permit to be approved. It leaves Plaintiffs and other residents in the untenable and unjustifiable position of having to guess, or to undergo the expense of submitting multiple, amended permit applications, as they endeavor to figure out what the Engineering Director will consider when reviewing permits to develop in the Steep Slope Transition Area. And, of course, what the Engineering Director may consider could very well shift from property to property and permit to permit.

46.     In sum, under MC-01-2024, Plaintiffs cannot develop any structure, outside the very limited approved structures in the Steep Slope Zone, which still must be approved pursuant to an opaque and vague permitting process. The Ordinance only allows development in the Steep Slope Transition if Plaintiffs obtain a permit. Whether the permit is granted is at the sole discretion of the unelected Engineering Director who decides what matters for each individual permit application pursuant to unknown criteria. As a result of this *Kafkaesque* process, Plaintiffs are deprived of their use and enjoyment of their lakefront, which was the impetus for their purchase of their properties and a significant determining factor setting the price they paid for those properties.

47.     Plaintiffs were previously free to develop any structure in the Steep Slope Zone and the Steep Slope Transition Area before MC-01-2024 as long as they obtained a permit under Chapter 15.78 of the Winnetka Village Code. That Chapter provided a much more structured,

12

defined permitting process than the process established by the adoption of MC-01-2024 and Chapter 17.82 (described in greater detail below).

48.     The Ordinance unfairly leaves owners responsible for maintaining the bluffs without the corresponding benefits of ownership.

49.     MC-01-2024 provides the following graphic which depicts the areas on Plaintiffs' property where they can no longer develop:



Ex. 1, Ex. A to MC-01-2024, § 17.82.020.

**C.  The Ordinance's Detrimental Impact on Plaintiffs' Lakefront Properties**

50.     MC-01-2024's prohibition on development negatively impacts Plaintiffs' and other residents' property values.

51.     Winnetka did not undertake any serious analysis of the impact on property values. Even an initial and rudimentary analysis would have demonstrated a loss of millions of dollars per property.  In the aggregate, the damages greatly exceed Winnetka's annual revenues.

52.     MC-01-2024 decreases the total area of developable property on Plaintiffs' property substantially.

53.     Plaintiffs bought their property on Lake Michigan with an expectation they would have an opportunity to develop their properties. Part of the value of owning lakefront property is the ability to develop on the land closest to the lake, including building on or around the bluffs. Now that Plaintiffs are restricted from doing so, the most valuable portions of their property cannot be developed.

**D.  Previous Permit Requirements Established a Rigorous and Adequate Framework to Regulate Construction on Property Along Lake Michigan**

54.     Winnetka's existing building and permitting requirements adequately regulated building and construction on property along Lake Michigan.  Indeed, Winnetka has not experienced any bluff failures in private properties along the lakefront.

55.     Chapter 15.78 of the Winnetka Village Code establishes the "permitting requirements for construction along, adjacent to and within Lake Michigan."

56.     In order to construct on property abutting Lake Michigan, residents are required to obtain a permit and any construction without a permit is subject to monetary penalties. Winnetka Code, § 15.78.030.

57.     A permit applicant must apprise and consult with Winnetka on the progress of the review of the covered construction by the permitting agencies so Winnetka can (i) fully understand exactly what type of construction or activity is being proposed by the application, (ii) provide comments and feedback on the application and project throughout the federal and state review process, and (iii) make a decision on the required permit within fourteen days. *Id.* §§ 15.78.040 & 15.78.050.

58.     Winnetka's Engineer is tasked with deciding to grant or deny the permit. *Id.* §

15.78.060. Winnetka Code provides that multiple criteria must be satisfied to acquire a permit

from the Engineer:

- The applicant must receive and provide all required permits for the covered construction from the permitting agencies.
- The height of the covered construction and any related structures will be no greater than what is minimally necessary to achieve the intended and proper purpose of the project and to be consistent with the purposes set forth in Section 15.78.010 of the Code.
- The covered construction and any related structures must comply with all other applicable provisions of Winnetka Code, including, without limitation, the construction permitting requirements of Chapter 15.32 of the Code.
- The covered construction and any related structures must include only what is minimally necessary to achieve the intended and proper purpose of the project and to be consistent with the purposes set forth in Section 15.78.010 of the Code.
- The covered construction and any related structures will not create any public safety hazards, including, without limitation, by unreasonably obstructing or otherwise interfering with ingress or egress to adjacent public beaches or private property.
- The covered construction and any related structures will not block or otherwise unreasonably interfere with the ability of public safety personnel to conduct search and rescue or other public safety operations.
- The covered construction and any related structures will alter existing sight lines along the Lake Michigan shoreline no more than is minimally necessary to achieve the intended and proper purpose of the project and to be consistent with the purposes set forth in Section 15.78.010 of the Code.

*Id.* § 15.78.080.

59.     The Engineer has inspection rights during the construction should a permit be

approved. *Id.* § 15.78.090.

60.     The Code allows applicants to appeal to the Council the decision by the Engineer.

*Id.* § 15.78.070.

61.     Unlike MC-01-2024 and Chapter 17.82 of the Code introduced with MC-01-2024,

Chapter 15.78 establishes a collaborative process with property owners. The process under Chapter

15.78 is much better defined than the process adopted by MC-01-2024 and Chapter 17.82.

62.     Building on private property in Winnetka along Lake Michigan already had a robust and adequate set of requirements.  MC-01-2024 was unnecessary and undercuts the collaborative benefits of the permitting process.

**E.  Winnetka Improperly Relied on Other Municipalities' Zoning Ordinances**

63.     In January 2023, the Council requested the Community Development and Engineering Departments to analyze steep slope ordinances in other Illinois communities. Memoranda submitted to the Council reviewed the ordinances of Evanston, Glencoe, Highland Park, Kenilworth, Lake Forest, Lake Bluff, and Wilmette.

64.     Glencoe, Highland Park, Lake Bluff and Lake Forest are located north of Winnetka and the topography in these communities is distinct from Winnetka.  The region north of Winnetka is comprised of steep cliffs and bluffs formed by erosion compared to the topography in Winnetka which is flatter with a gentler slopping region with bluffs formed by the deposition of sediment.

65.     Kenilworth is directly south of Winnetka and does have a steep slope ordinance. But two of the other examined communities, Evanston and Wilmette are south of Winnetka and do not have steep slope regulations. Evanston and Wilmette have relied on the same system to regulate bluff development as Winnetka prior to the adoption of MC-01-2024.

66.     Each of these communities have distinct topography and bluffs. Thus, each community must enact ordinances to suit the specific needs of their own bluffs.

67.     In the Community Development and Engineering memoranda, the focus of the analysis was on the dimensions for the steep slope ordinances and regulations. Little attention was paid to the distinct nature of each communities' topography and bluffs.

68.     In spite of its unique geology, the Council abrogated its duties and decided to legislate by simply saying "me, too."

## COUNT I

**Declaratory Relief – Substantive Due Process Violations**
**Approval of MC-01-2024 on February 6, 2024**
**28 U.S.C. § 2201(a) & ILCS Const. Art. 1, § 2**

69.     Plaintiffs repeat, re-allege, and incorporate by reference all prior paragraphs contained in this Complaint.

70.     28 U.S.C. § 2201(a) provides that this Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

71.     An actual controversy exists between Plaintiffs and Winnetka because Plaintiffs' dispute that the passage of MC-01-2024 was within the power of Winnetka and because passage of the Ordinance affects Plaintiffs' rights as residents and landowners in Winnetka.

72.     Plaintiffs and Winnetka are parties having adverse legal interests, mainly Winnetka believes that its passing of MC-01-2014 was valid and Plaintiffs assert that it was a violation of federal and state law.

73.     The dispute is of sufficient immediacy and reality to warrant issuance of a declaratory judgment because MC-01-2024 is now in effect and Plaintiffs cannot develop in the steep slope zone under MC-01-2024. If they do, they are subject to penalties.

74.     Winnetka's approval of the MC-01-2014 on February 6, 2024 was arbitrary and unreasonable, unrelated to a legitimate legislative purpose, and failed to consider the rights of Plaintiffs as mandated by the Illinois Supreme Court in *LaSalle National Bank of Chicago v. County of Cook*, 12 Ill.2d 40 (1957) and *Sinclair Pipe Line Co. v. Village of Richton Park*, 19 Ill.2d 370 (1960) (hereinafter the "LaSalle/Sinclair factors").

75.     Winnetka must consider the LaSalle/Sinclair factors when passing an ordinance, and those factors are: (1) the existing uses and zoning of nearby property; (2) the extent to which property values are diminished by the particular zoning restrictions; (3) the extent to which the destruction of the value of plaintiff's property promotes the health, safety, morals, or general welfare of the public; (4) the relative gain to the public compared to hardship imposed upon the individual property owner; (5) the suitability of the subject property for the zoned purposes; (6) the length of time the property has been vacant as zoned, considered in the context of land development in the vicinity; (7) community need for the proposed use; and (8) the care with which the community had undertaken to plan its land use development. *La Salle,* 12 Ill. 2d at 48; *Sinclair* 19 Ill. 2d at 378. Other courts also determines that whether a comprehensive government zoning plan for land use and development exists should be considered when determining a zoning ordinance's validity. *Forestview Homeowners Ass'n v. County of Cook*, 18 Ill. App. 3d 230, 232 (1st Dist. 1974).

76.     Winnetka failed to properly consider or apply the LaSalle/Sinclair factors when passing MC-01-2024.

**A. The LaSalle/Sinclair Factors**

**a)     The existing uses and zoning of nearby property**

77.     Under this factor, courts generally analyze the existing uses and zoning of nearby property such as within the same neighborhood or in close proximity to subject property.

78.     However, MC-01-2024 is unique in that it amends the zoning laws of the properties on the Lake Michigan lakefront and modeled itself after other municipalities steep slope zoning ordinances.

79.     The Council did not properly assess this factor because it did not take into account that the topography and bluffs in each community are distinct. The Council focused on the steep slope regulations of Glencoe, Highland Park, Lake Bluff, Lake Forest and Kenilworth for no valid reason.

80.     The Council ignored that the lakefronts of Glencoe, Highland Park, Lake Bluff and Lake Forest are north of Winnetka and share a distinct topography from Winnetka.

81.     Kenilworth is the only community south of Winnetka with steep slope regulations. However, the Council disregarded the fact that Wilmette and Evanston, the other two communities south of Winnetka that were analyzed, have no steep slope regulations.

82.     Yet the Council enacted MC-01-2024 because these other communities have steep slope ordinance. Trustee Handler was quoted in the Chicago Tribune stating, "[a]ll of our neighbors have this in place and have had it in place for quite some time. We're not inventing something new here."

83.     However, two of Winnetka's closest neighbors *do not* have steep slope ordinances in place.

84.     The Council may have looked at other uses and zoning of nearby properties but disregarded those that did not support its optimal goal, to restrict development on Plaintiffs' property.

85.     Moreover, the comparison it did perform was flawed. Winnetka has a distinct topography and location compared to all of the other communities. Basing Winnetka's steep slope ordinances on distinct environments is deficient. Winnetka needed to devote more time to precisely developing the correct regulations for Winnetka.

86.    The need to slow down was acknowledged by President Rintz, who stated shortly before the vote on the Ordinance: "I suggested on multiple times that we would, that we should, and I've talked to my colleagues on this, that we should potentially delay this so we can have those conversations and I'm going to put that out there again tonight.  And I know you guys don't want to do it, and that's fine.  But I believe that, that a couple conversations and a few weeks isn't going to make a difference one way or another.  We still have plenty of time in the abeyance period and I think these would be important conversations to see if we could do something to avoid the litigation."  Unfortunately, the Trustees ignored President Rintz's reasonable advice and passed the Ordinance.

        **b)**      **The extent to which property values are diminished by the particular zoning restrictions**

87.    At the January 9, 2024, and February 6, 2024, Council meetings and study sessions, the Council did not properly evaluate the diminished value of property owned by residents in Winnetka. Other residents voiced those concerns, but the Council failed to address them sufficiently.

88.    The materials submitted in support of MC-01-2024 by the Council did not properly address the issue either.  For example, the Council did not commission any valuation study.

89.    MC-01-2024 has significant effects on lakefront property in Winnetka. The ordinance decreases the developable land substantially.

90.    Plaintiffs and other residents of Winnetka cannot develop on the most valuable portions of their land, the area closest to Lake Michigan.

91.    The loss of value to Plaintiffs' and other residents' properties is in the millions of dollars.

92.    The Council failed to consider this factor properly.

c)     **The extent to which the destruction of the value of plaintiff's property promotes the health, safety, morals, or general welfare of the public**

93.     Not only did the Council not consider the diminished value of property owned by residents of Winnetka, but the Council did not sufficiently establish how MC-01-2024 promotes of the health, safety, morals, or general welfare of the public.

94.     MC-01-2024 states its purpose as:

*Bluffs are inherently fragile and subject to erosion due to glacially formed soils containing unstable sediment, rock and silt. Development and construction activity in and around bluffs could be hazardous to people and property and could accelerate the erosion process. This Chapter is not intended to regulate the aesthetic qualities of the bluffs. Instead, this Chapter is intended to protect the bluffs and ensure that construction on the bluffs of Lake Michigan within the Village do not cause environmental or ecological damage to Lake Michigan or the surrounding areas of the Village, or otherwise create harm or risk to the public health, safety, and welfare of the Village, its residents, or visitors.*

95.     Despite MC-01-2024's conclusory assertion, the ordinance does not ensure the health, safety, morals, or general welfare of the public.

96.     The private property owners can, and have, ensured the safety of the bluffs themselves.

97.     Moreover, the permitting requirements under Winnetka Code provide for a collaborative process between the residents, the Council, and the Engineer.  The safety of the bluffs can be ensured in that process.   And given that the Engineer has inspection rights once a permit is approved, Winnetka will have a role in the proper development that protects the bluffs.

98.     Given that the safety of the bluffs is already ensured under existing law, the destruction of the property values outweighs any perceived promotion of the health, safety, morals, or general welfare of the public.

99.     Moreover, because the Council did not consider the damage to Plaintiffs' property values, they clearly did not comply with this factor that tasks the Council with weighing that destruction of property value with the health, safety, morals or general welfare of the public.

> **d)     The relative gain to the public compared to hardship imposed upon the individual property owner**

100.    The Council did not compare the relative gain to the public as compared to the hardship imposed on the individual property owners.  As demonstrated above, there is little need for MC-01-2024 and the hardship imposed on the property owners is great.

101.    The residents, the Council, and the engineer can ensure the safety of the bluffs through the permitting process.

102.    Moreover, it is unclear what the relative gain to the public is by the passage of MC-01-2024.  Outside the conclusory assertions that MC-01-2024 promotes the health, safety, morals and general welfare of the public, the Council has failed to establish the benefit, especially where the bluffs exist on private property to which the public has no access.

> **e)     The suitability of the subject property for the zoned purposes**

103.    The reasons that Winnetka did not properly address this factor are similar to the reasons it did not properly evaluate the uses and zoning of nearby properties.

104.    Winnetka focused on the ordinances of other communities that have distinct topography and bluffs.  They skipped the crucial step to evaluate whether Winnetka's bluffs were suitable for MC-01-2024's purposes.

105.    Two of Winnetka's closest neighbors, Evanston and Wilmette have no such ordinances.

106. Moreover, Winnetka has decided to take individual property owners out of the equation. Those property owners have just as much incentive, if not more, to ensure protection of the bluffs on their own property.

        **f)     The length of time the property has been vacant as zoned, considered in the context of land development in the vicinity**

107. This factor is inapplicable to the decision to pass MC-01-2024.

        **g)     Community need for the proposed use**

108. The Council did not properly articulate the community need for MC-01-2024.

109. Throughout the process, the Council continually made conclusory statements on the value of the "preservation of bluffs." Plaintiffs' rights to use and develop their private properties outweigh any amorphous statement regarding a community benefit flowing from the "preservation of the bluffs."

110. Moreover, Winnetka continually disregarded Plaintiffs' and other residents' comments that bluff preservation could be ensured by the property owners themselves through the permitting requirements. Winnetka, the Engineer, and property owners already had a system in place that ensured the protection of the bluffs under Chapter 15.78 of Winnetka Code.

111. The reason the Council stayed silent on those points is because there is no community need for MC-01-2024.

        **h)     The care with which the community had undertaken to plan its land use development**

112. Many of Plaintiffs have development plans that date back to before the passage of MC-01-2024. Additionally, many of Plaintiffs purchased their properties to develop on land in the steep slope zone.

113.    Winnetka did not properly consider the effect MC-01-2024 would have on development plans of Plaintiffs' property.

114.    Moreover, there are numerous existing structures in the steep slope zone. In the Executive Summary for the introduction of MC-01-2024, Winnetka explained that property owners with existing structures in the steep slope zone would not have to demolish those structures.

115.    But this does not account for the issue that existing structures will inevitably need to be developed due to destruction or damage or natural decay.  Moreover, Plaintiffs or residents may desire to move existing structures on their properties. MC-01-2024 or the Council's deliberations regarding the Ordinance do not account for this.

116.    Under MC-01-2024, Winnetka can reject property owners' ability to address such issues with their existing structures.

117.    Thus, the Council did not properly consider existing land use development plans.

    i)  **Whether a comprehensive government zoning plan for land use and development exists.**

118.    Winnetka had an existing comprehensive government zoning plan for land use and development.

119.    Under Chapter 15.78 of Winnetka Code, the Council, Engineer, and property owners were required to work together to properly develop along Lake Michigan. Moreover, there was a defined set criterion and process the property owner needed to comply with.

120.    MC-01-2024 is not in harmony with that regime.  It cuts off the collaborative goals of the permitting regulations under Chapter 15.78 and shuts the property owners out of the conversation. MC-01-2024 completely forbids development in the Steep Slope Zone and the permitting process for development in the Steep Slope Transition Area are vague and affords the Engineering Director authority to deem what matters.

121.     Plaintiffs had a defined process to obtain a permit under Chapter 15.78 and now are left guessing at what they must do in order to obtain a permit under Chapter 17.82 introduced with MC-01-2024.

122.     The Council disregarded that the proper process was already in place in order to achieve their ultimate goal, to prohibit development in steep slope zone.

**B.  MC-01-2024 Violates Plaintiffs' Substantive Due Process**

123.     Thus, Plaintiffs' substantive due process rights have been violated pursuant to the Illinois Constitution, Article. 1, § 2 because Winnetka did not properly consider or apply the LaSalle/Sinclair factors.

124.     Winnetka's decision to approve MC-01-2024 was arbitrary and unreasonable, unrelated to a legitimate legislative purpose, and failed to consider the rights of Plaintiffs because it disregarded the damage that MC-01-2024 would have on Plaintiffs' rights, arbitrarily based MC-01-2024 on ordinances of different communities and never articulated the true need for the ordinance.

WHEREFORE, Plaintiffs respectfully request this Court enter an order declaring:

a)     That Winnetka's passage of MC-01-2024 was arbitrary and unreasonable, unrelated to any proper legislative purpose, and in violation of Plaintiffs' substantive due process rights pursuant to Article I, § 2 of the Illinois Constitution;

b)     That MC-01-2024 is invalid as a matter of law;

c)     Any other relief this Courts deems equitable and just.

## COUNT II

**Compensation for Winnetka's taking of Plaintiffs' property without just compensation through the Approval of MC-01-2024 on February 6, 2024**
**United States Const. amends. V & XIV and 42 U.S.C. § 1983**

125.     Plaintiffs repeat, re-allege, and incorporate by reference all prior paragraphs contained in this Complaint.

126.    The Takings Clause of the Fifth Amendment to the United States Constitution prohibits the government from taking private property for public use without just compensation.

127.    The Takings Clause applies to the State of Illinois through the Fourteenth Amendment and 42 U.S.C. § 1983.

128.    To state a takings claim, Plaintiffs must show:

- a property interest;
- that has been taken under the color of state law (a public use); and
- without just compensation.

129.    Plaintiffs all own property which is impacted by the passing of MC-01-2024.

130.    Winnetka passed MC-01-2024 for a public use, MC-01-2024 lists its purposes as follows:

- "To protect the environment and the integrity of the Lake Michigan coastal area that is a distinctive and valuable feature of the Lake Michigan shoreline;"
- "To recognize the potential for hazards that could affect health and safety to persons and property from significant bluff and shoreline development;"
- "To maintain the stability of the coastal bluffs and shorelines and to reduce the risks of coastal erosion, undermining, slumping, or collapse of the bluffs, and to protect the waters of Lake Michigan from unnatural sedimentation;"
- "To promote the recommendations of the Village of Winnetka Comprehensive Plan relative to the constraints that should be considered in developments that impact coastal areas and environments …."

Ex. 1, MC-01-2024.

131.    MC-01-2024 prohibits all development, outside the potential for a very few, limited permitted uses, in the steep slope zones of Plaintiffs' properties.

132.    Plaintiffs could develop in the steep slope zone before the passage of MC-01-2024. Many of Plaintiffs purchased the land specifically with the expectation and understanding that they would be permitted to develop in the steep slope zone of their properties.  Now Plaintiffs cannot develop and MC-01-2024 is expected to reduce each Plaintiff's property value in the millions of dollars.

133.    Winnetka has denied Plaintiffs of all economically beneficial or productive use of their property in the steep slope zone rendering the land useless.

134.    The passage of MC-01-2024 was for a purported public use and resulted in the taking of Plaintiffs' properties.

135.    Since Winnetka passed MC-01-2024, Plaintiffs have received no compensation and are owed just compensation.

WHEREFORE, Plaintiffs respectfully request this Court enter an order declaring:

a)    That Winnetka's passage of MC-01-2024 was a taking of Plaintiffs' private property under the color of law by Winnetka;
b)    That Plaintiffs have not received just compensation for the taking;
c)    That Plaintiffs are owed and awarded in an amount to be determined at trial;
d)    Any other relief this Courts deems equitable and just.

## COUNT III

**Compensation for Winnetka's taking of Plaintiffs' property without just compensation
through the Approval of MC-01-2024 on February 6, 2024
Illinois Const. Art. I § 15**

136.    Plaintiffs repeat, re-allege, and incorporate by reference all prior paragraphs contained in this Complaint.

137.    Article I, section 15 of the Illinois Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation as provided by law." Illinois Const. Art. I § 15.

138.    The takings clause of the Illinois Constitution provides greater protection for property owners than its counterpart in the United States Constitution, because it provides a remedy for property that is damaged, in addition to property that is taken.

139.    To state an Illinois takings claim, a Plaintiffs must show:

- a property interest;

- that has been taken or damaged under the color of state law for a public use; and
- without just compensation.

140.    Plaintiffs all own property which is impacted by the passing of MC-01-2024.

141.    Winnetka passed MC-01-2024 was passed for a public use, MC-01-2024 lists its purposes as follows:

- "To protect the environment and the integrity of the Lake Michigan coastal area that is a distinctive and valuable feature of the Lake Michigan shoreline;"
- "To recognize the potential for hazards that could affect health and safety to persons and property from significant bluff and shoreline development;"
- "To maintain the stability of the coastal bluffs and shorelines and to reduce the risks of coastal erosion, undermining, slumping, or collapse of the bluffs, and to protect the waters of Lake Michigan from unnatural sedimentation;"
- "To promote the recommendations of the Village of Winnetka Comprehensive Plan relative to the constraints that should be considered in developments that impact coastal areas and environments …."

Ex. 1, MC-01-2024.

142.    MC-01-2024 amended Winnetka Code to prohibit development, outside limited permitted uses, in the steep slope zone which extends onto Plaintiffs' property.

143.    Plaintiffs could develop in the steep slope zone before the passage of MC-01-2024. Many of Plaintiffs purchased the land specifically to develop in the steep slope zone. Now Plaintiffs cannot develop and MC-01-2024 is expected to reduce Plaintiffs' property value in the millions of dollars.

144.    Winnetka has denied Plaintiffs of all economically beneficial or productive use of their property in the steep slope zone rendering the land useless.

145.    The passing of MC-01-2024 was for a purported public use and resulted in the taking and damage of Plaintiffs' properties.

146.     Since Winnetka passed MC-01-2024, Plaintiffs have received no compensation and are owed just compensation.

WHEREFORE, Plaintiffs respectfully request this Court enter an order declaring:

a)     That Winnetka's passing of MC-01-2024 was a taking of Plaintiffs' private property under the color of law by Winnetka;
b)     That Plaintiffs have not received just compensation for the taking;
c)     That Plaintiffs are owed and awarded in an amount to be determined at trial;
d)     Any other relief this Courts deems equitable and just.

## JURY DEMAND

The Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  May 2, 2024                          Respectfully submitted,

By: _Mark L Karasik_____
       Mark Lionel Karasik (ARDC No. 6180292)
       Colleen Baime (ARDC No. 6217224)
       Jon Ebner (ARDC No. 6291526)
       BAKER & McKENZIE LLP
       300 East Randolph Street, Suite 5000
       Chicago, IL 60601
       Telephone: (312) 861-8615
       Mark.Karasik@bakermckenzie.com
       Colleen.Baime@bakermckenzie.com
       Jon.Ebner@bakermckenzie.com

       *Counsel for Plaintiffs*